IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

SAMUEL CARROLL,                 §
    Plaintiff,                  §
                      §
vs.                             §          CIVIL ACTION NO. H-01-1022
                      §
JO ANNE B. BARNHART,            §
Commissioner, Social            §
Security Administration,        §
    Defendant.                  §

**MEMORANDUM AND RECOMMENDATION ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This matter was referred by United States District Judge Lee H. Rosenthal, for full pre-trial management, under 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry # 4). Before the court are competing motions for summary judgment, which were filed by Plaintiff Samuel Carroll ("Plaintiff," "Carroll") and Defendant Jo Anne B. Barnhart, in her capacity as Commissioner of the Social Security Administration. ("Defendant," "the Commissioner"). (Plaintiff's Motion For Summary Judgment and Supporting Brief ["Plaintiff's Motion"], Docket Entry # 21; Defendant's Motion For Summary Judgment ["Defendant's Motion"], Docket Entry # 19; Defendant's Memorandum in Support of Cross Motion for Summary Judgment ["Defendant's Memorandum"], Docket Entry # 20). Each party has responded to the other's motion. (Defendant's Response to Plaintiff's Motion for Summary Judgment ["Defendant's Response"], Docket Entry # 23; Plaintiff's Reply to Defendant's Cross Motion for Summary Judgment ["Plaintiff's Response"], Docket Entry # 22). After considering the motions, the evidence submitted, and the applicable law, it is RECOMMENDED that Plaintiff's motion be **DENIED**, and that Defendant's motion be **GRANTED**.

1

**Background**

Carroll originally filed this lawsuit, pursuant to § 205(g) of the Social Security Act ("the Act") (codified as amended at 42 U.S.C. § 405(g)(1994)), on March 26, 2001.  ( Complaint ["Complaint"], Docket Entry # 1).  In this action, he appeals the Commissioner's decision to deny his claim for Disability Insurance Benefits ("DIB") under Title II of the Act.  (*Id.*).  Carroll asks the court to reverse that decision, and to render a judgment in his favor.  (*Id.*).  Carroll claims that the ALJ's finding that he can perform light work is erroneous because, in making that decision, he did not consider his all of his impairments.  Had he done so, Plaintiff argues, those would have precluded his ability to do any work.  Plaintiff also contends that the ALJ made two errors by relying on the testimony of the vocational expert witness to deny his claim.  He alleges, first, that the ALJ failed to include all of his non-exertional limitations in the hypothetical question he posed to the vocational expert witness.  He also complains that the ALJ failed to elicit testimony from her on any specific jobs that he is able to perform, given his limitations.  (Plaintiff's Motion at 15).  Defendant seeks a summary judgment on Plaintiff's claims, arguing that the ALJ's decision is supported by the relevant evidence, and should not be disturbed.  She points out that any allegedly disabling impairments arose after Carroll's eligibility for benefits had expired, and for that reason, the ALJ's decision is proper, and no reversal or remand is justified in this instance.

Plaintiff filed his application for DIB benefits on April 26, 1999. (Tr. at 70).  In a "Disability Report" that he completed for the Social Security Administration ("SSA"), he claimed that he had been unable to work since April 28, 1993, due to a "broke[n] left leg, nerve damage, drop left foot, cirrhosis of [the] liver, [a] gunshot wound to the chest, arthritis, anemia, blackouts, chest pain, [and] dizziness."  (Tr. at 71).  Carroll's request for benefits was denied on July 14, 1999. (Tr. at 34).  The

SSA determined that Carroll's insured status ended on March 31, 1998, and that he was not shown to be disabled prior to that date.  (Tr. at 38).  The next day, Plaintiff asked the SSA to reconsider that decision.  (Tr. at 339).  On August 4, 1999, the SSA again evaluated the medical evidence, from the relevant period, but concluded that the determination to deny his claim was "proper under the law."  (Tr. at 34).   He then requested a hearing before an ALJ.  (Tr. at 44).  That hearing took place on April 22, 2000, and the ALJ rendered an unfavorable decision on May 11, 2000.  (Tr. at 30, 48).  After Plaintiff's request for a review of this decision was denied on July 25, 2000, he then filed this suit.  (Tr. at 20).  On May 15, 2002, however, the Commissioner filed a motion to remand the claim because Carroll's file had not been prepared,[1] and the tape of the April 2000 hearing could not be located.  (Defendant's Unopposed Motion for Remand ["Motion for Remand"], Docket Entry # 9; Order, Docket Entry # 11).   That motion was granted, and Carroll's claim was returned to the Commissioner for consideration.  (Order, Docket Entry 11).  On March 21, 2005, the Commissioner filed an unopposed motion to vacate the remand order, representing that a second "hearing was held, transcription of the administrative and other supporting documents have been completed, and the transcript has been certified by the Office of Hearings and Appeals."  (Defendant's Unopposed Motion to Vacate the Order for Remand, Docket Entry # 13 at 1-2).  That motion was granted, and it is the ALJ's decision from that second hearing, in 2003, that is in dispute.  (Order, Docket Entry # 16).

---

[1] In the Commissioner's motion, she stated that no claim file had been prepared because a "January 29, 2001," opinion from an ALJ was missing.  (Motion for Remand at 1).  In Defendant's Memorandum, however, the Commissioner reports that no 2001 decision, in fact, exists.  (Docket Entry # 20).  Apparently, the tape of the April 2000 hearing was never found, however, and so Plaintiff was given another hearing in 2003.  It is that hearing decision which is now before the court.

On September 4, 2003, ALJ Larry C. Marcy conducted a second hearing to review Carroll's claims de novo. (Tr. at 14).  Carroll was represented at the hearing by an attorney, he testified on his own behalf, and John Guyton, his pastor, testified for him, as well.  (*Id.*).  The ALJ also heard testimony from a medical expert witness,[2] and from Caroline Fisher, a vocational expert witness. (Tr.).  In addition to the testimony, the ALJ reviewed medical records from Dr. Wayne Riley; The Methodist Hospital; Dr. Michael Huo; Dr. Evan D. Collins; Dr. Maher M. Nasser; Park Plaza Hospital; St. Luke's Hospital; Cardiology of Houston; and Walter McReynolds, M.D.  (Tr. at 106-68, 206-491).  The ALJ also had the benefit of two case assessment forms, based on a review of Plaintiff's file, which were prepared by Dr. F.B. Higgins and Dr. John R. Wiley. (Tr. at 69-70).  A letter from Plaintiff's wife was also presented as evidence at the hearing. (Tr. at 196).

Following the hearing, the ALJ engaged in the following five-step, sequential analysis to determine whether Plaintiff was capable of performing substantial gainful activity or was, in fact, disabled:

1.     An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings.  20 C.F.R. §§ 404.1520(b) and 416.920(b).

2.     An individual who does not have a "severe impairment" will not be found to be disabled.  20 C.F.R. §§ 404.1520(c) and 416.920(c).

3.     An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will not be considered disabled without consideration of vocational factors.  20 C.F.R. §§ 404.1520(d) and 416.920(d).

4.     If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.  20 C.F.R. §§ 404.1520(e) and 416.920(e).

5.     If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual

---

[2] The record appears to identify Dr. Hoang as the designated medical expert witness who was to testify at the hearing. (Tr. at 14, 174).  However, the transcript refers to the witness as a "Dr. Haney." (Tr. at 493, 514).  The court is satisfied, from the record as a whole, that the transcript is erroneous, and it was Dr. Hoang who testified.

functional capacity must be considered to determine if any work can be performed.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).  It is well-settled that, under this analysis, Carroll has the burden to prove any disability that is relevant to the first four steps. *Wren*, 925 F.2 at 125; *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987).  If he is successful, the burden then shifts to the Commissioner, at step five, to show that he is able to perform other work that exists in the national economy.  *Myers v. Apfel,* 238 F.3d 617, 619 (5th Cir. 2001)*; Wren*, 925 F.2d at 125.  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir.1987).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability.  *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992)(quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).  An individual claiming benefits under the Act has the burden to prove that he suffers from a disability.  *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).  A claimant is deemed disabled, under the Act, only if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months."  *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990)(citing 42 U.S.C. § 423(d)(1)(A)).  Substantial gainful activity is defined as "work activity involving significant physical or mental abilities for pay or profit."  *Newton*, 209 F.3d at 452.  A physical or mental impairment is "an impairment that results

from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983; 42 U.S.C. § 423(d)(3)).  Further, the impairment must be so severe as to limit the claimant so that "he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any kind of substantial gainful work which exists in the national economy." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 423(d)(2)(A)).

On September 24, 2003, the ALJ issued a written decision denying Carroll's claim.  Based on the applicable legal principles, and the evidence before him, the ALJ determined that Carroll suffers from "heart disease, arthritis, and left knee surgery impairments."  (Tr. at 16).  Although he found that these conditions are "severe," he concluded, ultimately, that none of them meet, or equal in severity, the medical criteria for any disabling impairments listed in the relevant Social Security Regulations.  (*Id.*).  Based on those findings, the ALJ concluded, at step five of his analysis, that Carroll is unable to perform his past work, but that he had acquired skills that could be transferred to other available jobs.  He found further that Carroll had the residual functional capacity to perform light work on March 31, 1998, the date his eligibility for benefits expired.  (Tr. at 19).  For that reason, the ALJ found that Carroll was "not under a 'disability' as defined in the Social Security Act."  (*Id.*).

Following the ALJ's decision, Plaintiff asked the SSA Appeals Council ("Appeals Council") to review his conclusion.  (Tr. at 7).  SSA regulations provide that the Appeals Council will grant a request for a review if any of the following circumstances are present: "(1) there is an apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's action, findings, or conclusions are not supported by substantial evidence; or (4) there is a broad policy issue which

may affect the public interest."  20 C.F.R. §§ 404.970, 416.1470.  On December 4, 2004, after considering the applicable regulations, the evidence submitted, and Plaintiff's contentions, the Appeals Council concluded that there was "no reason" to assume jurisdiction over the case.  (Tr. at 5).  Accordingly, the ALJ's findings became final, and it is that decision which Plaintiff has appealed to this court under 42 U.S.C. § 405(g).

**Standard of Review**

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the Commissioner used proper legal standards to evaluate the evidence.  *Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)).  "If the Commissioner's findings are supported by substantial evidence, they must be affirmed."  *Id.* (citing *Martinez*, 64 F.3d at 173).  "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion.  It is more than a mere scintilla and less than a preponderance."  *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *Martinez*, 64 F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)).  On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision."  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987).  If no credible evidentiary choices or medical findings exist that support the Commissioner's decision, then a finding of no substantial evidence is proper.  *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988).

**Discussion**

In this instance, the ALJ found, at the outset, that Carroll's eligibility for disability benefits ended on March 31, 1998, the date on which his insurance expired.  Following the hearing, he concluded that, although Carroll was "unable to perform any of his past relevant work," as of the date he was last insured, he was capable of "making a successful adjustment to work that existed in the national economy," based on his age, education, and work experience.  (Tr. at 18).  He determined, specifically, that Plaintiff's residual functional capacity on the last date of eligibility would have allowed him to perform all of the requirements of "light work," with some restrictions.  (Tr. at 17).  Plaintiff contends, however, that the ALJ erred in reaching that conclusion because, among other things, he did not give proper consideration to all of his impairments in his assessment.  (Plaintiff's Motion at 1).  He also complains that the ALJ erred because he not only presented a flawed hypothetical question to the vocational expert witness about available employment, he also neglected to elicit from her any specific jobs that he could perform.  (*Id.*).  In response, the Commissioner contends that the ALJ followed all of the proper procedures to determine whether Carroll was disabled on the relevant date.  (Defendant's Memorandum at 6).  Defendant asks the court to affirm the administrative decision because it was based on the substantial evidence presented to the ALJ.  (*Id.* at 12).

In evaluating these arguments, the court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards were applied.  *Myers v. Apfel,*  238 F.3d 617, 619 (5th Cir. 2001)  (citing *Greenspan v. Shalala,*  38 F.3d 232, 236 (5th Cir. 1994)).  To do so, the court must weigh the following four factors: the objective medical facts; the diagnoses and opinions from treating physicians on subsidiary questions of fact; Plaintiff's own testimony about pain; and Plaintiff's educational

background, work history, and present age.  *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

Any conflict in the evidence is to be resolved by the ALJ and not the court.  *Newton*, 209 F.3d at

452.

As a threshold matter, Plaintiff does not dispute that his eligibility period for disability

benefits ended on March 31, 1998.  That date is critical to the court's review, because a claimant "is

not entitled to benefits unless he was disabled, within the meaning of the relevant statutes and

regulations, on or before . . . the date upon which he last enjoyed insured status under the Act."

*Carey v. Apfel*, 230 F.3d 131, 134 (5th Cir. 2000); *see also Loza v. Apfel*, 219 F.3d 378, 381, 394

(5th Cir. 2000).  "Claimants bear the burden of establishing a disabling condition before the

expiration of their insured status."  *Loza*, 219 F.3d at 394; *Ivy v. Sullivan*, 898 F.2d 1045, 1048 (5th

Cir. 1990); *see also Torres v. Shalala*, 48 F.3d 887, 889 (5th Cir. 1995); *Milam v. Bowen*, 782 F.2d

1284, 1286 (5th Cir. 1986).  Further, any "impairment which arose or became disabling after [that

date] . . . cannot be the basis for a finding of disability."  *Milam*, 782 F.2d at 1286.  It follows that

it is Plaintiff's burden to establish that he suffered from a disability, as defined by the Act, on or

before March 31, 1998.  *See Carey*, 230 F.3d at 134;  *Loza*, 219 F.3d at 381, 394; *Torres*, 48 F.3d

at 889; *Milam*, 782 F.2d at 1286.  Moreover, any "[e]vidence showing the degeneration of his

condition after that date [is] not relevant to the [current] analysis."  *Torres*, 48 F.3d at 894 n.12.  For

this reason, only the medical and other records that pertain to any alleged disability that existed on

or before March 31, 1998, are appropriate for review.

### 1. Objective Medical Evidence

The first medical record in evidence is from September 26, 1997, and it details an

appointment Carroll had with his treating physician, Dr. Wayne Riley.  (Tr. at 108, 454).  On that

date, Plaintiff was complaining of "[c]hronic productive cough, chest pain, breathing difficulties, shortness of breath, dizziness, [and] foot numbness." (*Id.*). He also reported that, in 1993, he had been shot in the chest, that he has "arthritis, has smoked one pack of cigarettes every day for approximately 31 years, and drinks a six-pack of beer every day." (Tr. at 108). Dr. Riley noted that Carroll "[a]dmits he cannot stop drinking, [and] his longest period [of] sob[riety] was six months." (*Id.*). Following his examination, Dr. Riley observed that Plaintiff's "[h]eart [was] slightly tachycardic without murmurs, rubs, or gallops," and that his lungs were clear with some "crackles at the bases." (*Id.*). Dr. Riley summed up Plaintiff's physical condition on that date, as follows:

> [A]n impressive history of alcohol use and a 31 year history of smoking approximately one pack per day. I have discussed with the patient the fact that his alcohol use does seem excessive…. His chronic productive cough and sputum production may indeed [be] signs and symptom complex consistent with the diagnosis of chronic obstructive pulmonary disease…. His upper respiratory infection symptoms may be related to … allergic rhinitis … numbness …of his legs may be a sign and symptom complex consistent with a vitamin deficiency…given his extensive alcohol history. I talked with the patient today to reinforce the fact that his drinking history is much too excessive and that he should make any effort he can to stop or limit the amount of alcohol he takes in. His symptoms with regard to sputum, etc., may in fact be COPD.[3] We will go ahead and get routine laboratory studies in order to fully evaluate that.

(Tr. 108-09, 440-41). On October 3, 1997, Carroll returned to Dr. Riley for an explanation of the lab results. The tests showed that "[h]is LFT [liver function test was] elevated and he was anemic." (Tr. 110, 442, 444). Further Dr. Riley noted that all of the lab results "indicator[ed] … [alcohol] abuse." He then advised Plaintiff that he "must stop drinking as his liver is at risk of further damage." (*Id.*). The test results also showed some "linear density" in both lungs that appeared to

---

[3] Chronic obstructive pulmonary disease. Pulmonary disease is "an abnormal condition of the respiratory system, characterized by cough, chest pain, … [and] sputum production." *Mosby's Dictionary, Medical, Nursing, and Allied Health* 1353 (5th ed. 1998).

be "related to atelectasis[4] and/or old scarring." No "pleural effusion [was] seen," however.  (Tr. at 123, 445).

Plaintiff's next appointment with Dr. Riley was on October 5, 1998, and on that date, he again complained of congestion and a cough.  (Tr. 108, 439).  He told Dr. Riley that he was "still smoking a pack a day and drinking a six-pack a day."  (*Id.*).  Carroll also complained that he "feels tired all the time and has trouble keeping food down."  (*Id.*).  He further "described SOB [shortness of breath] and chest discomfort," and complained of numbness in his feet.  (*Id.*).  Dr. Riley noted that there was "no gait disturbance," but ordered several tests to assist with a diagnosis of these added complaints. He again counseled Carroll "on [the] adverse consequences of continued [alcohol] use." (Tr. at 107).  The test results from that date included a doppler echocardiography[5] report, which revealed that the "[p]atient was in sinus rhythm during the study," with "[n]o flow abnormalities" detected.  (Tr. at 126).  A different test, an echocardiography, also showed that "[a]ll findings" were "[n]ormal." (Tr. at 124).  Carroll's chest X-ray revealed "no significant change since the 9/26/97 examination."  (Tr. at 407, 424).  On November 1, 1998, Carroll returned to Dr. Riley because he was experiencing numbness and tingling in his lower extremities.  (Tr. at 417).  Dr. Riley ordered several additional tests to determine the cause.  The tests revealed significant anemia, and Dr. Riley again strongly urged Carroll to stop drinking, warning that, if he continued to do so at the current rate, "he will do further damage to his liver and ultimately succumb to liver failure."  (Tr. at 417).  Doppler echocardiography and echocardiography reports dated October 20, 1998, again

---

[4] "An abnormal condition … preventing the respiratory exchange of carbon dioxide and oxygen." *Id.* at 141.

[5] Echocardiography is "a diagnostic procedure for studying the structure and motion of the heart." *Id.* at 531.

showed normal findings.  (Tr. 412, 414).  A CT scan, done on November 4, 1998, revealed that Plaintiff's "heart appears to be somewhat enlarged,"  with the aorta showing "some calcification, but there is no aneurysm identified." (Tr. at 384).  The clinical "impression" for the testing was a "prominent liver, otherwise no significant abnormality is recognized." (Tr. at 384).  At Plaintiff's next appointment, April 6, 1999, he told Dr. Riley that he had been abstaining from alcohol for "2-3 months," and that he "feels well."  The doctor observed that he was in no distress, and encouraged him to "continue [his] abstinence from alcohol." (Tr. at 462).

On February 12, 1999, Carroll was admitted to Methodist Hospital after he fractured his left leg.  (Tr. at 377).  The fracture required surgery and the insertion of "cannulated screws and [a] buttress plate." (Tr. 373, 377).  The break was severe enough to cause peroneal nerve damage.[6] (*Id.*).  While in the hospital with the broken leg, Carroll was also treated for "persistent spiking temperatures." (Tr. at 435).  During his hospital stay, Plaintiff recounted his medical history to consulting physicians, including the gun shot wound in 1993, and his chronic cough.  (Tr. at 435).  The hospital records also detail evidence of liver disease due to alcoholism.  (Tr. 436).  Plaintiff's neck was found to be  "supple with full range of motion," and his lungs were "clear." (Tr. at 436).  A CT scan done on February 12, 1999, showed his "heart size is normal." (Tr. at 381).  On February 13, 1999, Dr. Michael Huo consulted with Carroll about his liver disease.  (Tr. at 361).  Plaintiff admitted to consuming a six-pack of beer every day.  (*Id.*).  Carroll was discharged from Methodist Hospital, on March 1, 1999, after his fever was treated successfully.  (Tr. at 378).

 In December 2000, Plaintiff underwent a myocardial perfusion imaging test which showed an "abnormal perfusion study." (Tr. at 233).  The event prompting the test and subsequent treatment

---

[6] The peroneal nerve is located on "the outer part of the leg."  *Id.* at 1244.

is not evident from the record, however.  Following the test results, Plaintiff was admitted into Park Plaza hospital on January 15, 2001.  (Tr. at 239-42).  Dr. Maher Nasser performed a "coronary angioplasty," and a "cardiac catheterization," and Carroll was discharged the next day.  (*Id.*).  The discharge summary noted that "[t]here was a questionable myocardial  infarction in 1997."  (*Id.*).


### *2. Opinions and Diagnoses*

In determining the sufficiency of the evidence to support an ALJ's decision, the court must consider any diagnoses or expert opinions, from treating and examining physicians, on subsidiary questions of fact.  "[O]rdinarily the opinions, diagnoses and medical evidence of a treating physician who is familiar with the claimant's injuries, treatment, and responses should be accorded considerable weight in determining disability." *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985). It is the ALJ's duty, as fact finder, to determine the credibility of the medical reports and the testimony given by treating doctors.  *Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991).

In this instance, the ALJ did not have an assessment of Plaintiff's condition from either an examining or a treating physician to consider. He did elicit the testimony of a medical expert witness, Dr. Hoang, who reviewed the available medical records,  and he had the results from two "Case Assessment Forms," which were apparently prepared on behalf of the state agency.  (Tr. at 169-70).  The first of these, signed by F.B. Higgins, M.D., on June 10, 1999, merely noted his "technical denial" of benefits because of "[i]nsufficient evidence to cover allegations prior to D[ate] L[ast] I[nsured] of 3/31/97."  (Tr. at 169).   The second form, signed by John R. Wiley, M.D., concluded that, before Plaintiff's eligibility expired, he suffered from "cirrhosis, possible COPD, and chest GSW [gunshot wound] and [alcohol] abuse, but no evidence of [his] condition

meeting/equal[ing] listings, or of med[ical] voc[ational] allowance." (Tr. at 170). Dr. Wiley also issued a "technical denial" of benefits based on Plaintiff's documented medical condition as of March 31, 1998, the date his insured status expired. (*Id.*).

At the administrative hearing, the ALJ questioned Dr. Hoang, a medical expert witness engaged by the SSA to review the relevant medical records. The transcript of Dr. Hoang's testimony is peppered with references to statements from the hearing participants which were inaudible. For that reason, this testimony is somewhat difficult to assess. Dr. Hoang did note that, from his review of the record, Plaintiff "has a major dysfunction of a weight bearing joint of the left knee" which resulted from a fracture to his left leg in February 1999. (Tr. at 515). Significantly, however, he stated that the earliest time "in the medical record (INAUDIBLE) problem with his heart was actually … December 01, 2000[,] when he has [sic] a stress test [and] it was abnormal." (*Id.*). Dr. Hoang was then questioned by Plaintiff's attorney, who asked him about all of the available evidence on Carroll's heart condition. (Tr. at 516). The attorney directed Dr. Hoang's attention to the discharge summary, prepared by Dr. Nasser in January 2001, which stated "there was a questionable myocardial infarction in 1997." (Tr. 239). Dr. Hoang was then asked whether "[t]his is some indication that he started having heart problems as early as 1997?" (Tr. at 516). In response, Dr. Hoang stated that, "I don't see any entry about any heart problem." (Tr. at 516-17). He was then asked whether it was "likely" that the 2001 surgery was preceded by problems "for some period of time before the surgery was actually done?" The doctor answered that such a problem may be likely, but that it was not possible to pinpoint when Plaintiff's heart problems actually began because "we don't have the record." (*Id.*). When asked to identify the earliest date

14

on which any heart problem was noted, Dr. Hoang pointed to a cardiogram performed in August of 1998.

He testified that,

> [a]t that time the (INAUDIBLE) was pretty good.  He has ejection fraction of 55, (INAUDIBLE) and all of the, you know, (INAUDIBLE) are normal size.  So (INAUDIBLE) about a serious problem with the function of the heart.

(Tr. at 518).

### 3. Plaintiff's Educational Background, Work History, and Age

In March 1998, Plaintiff was 47 years old.  He testified at the hearing that he had completed high school, and had never received any vocational training.  (Tr. at 18, 495).  He told the ALJ that he had been employed in the past as a truck driver for a number of different companies.  (Tr. at 496).

### 4. Subjective Complaints

To determine Plaintiff's capacity to work, the ALJ also considered his subjective complaints. (Tr. at 16-17).  At the hearing, Carroll testified that he had stopped working in 1993, after he was shot.  (Tr. at 497).  He also told the ALJ that he had suffered from arthritis since he was about "15 years old."  (*Id.*).  Carroll told the ALJ that, because of the arthritis, "my knees, my shoulder, and my feet would swell."  (Tr. at 498).  He explained that, to drive 18-wheeled trucks, he had to "press[] the clutch down and my knee would swell so that I'd have to use my hand to press my knee in order to press the clutch."  (*Id.*).  Carroll testified that, in 1997, and early 1998, he was experiencing painful swelling in these joints, "especially my left one."  (Tr. at 504).  He said that his left leg was the weaker of the two, and that it was fractured in 1999, when "it just gave out on me."  He also testified that, "certain times I couldn't even walk without a cane" because of

15

inflammation from his arthritis.  (Tr. at 505).  Carroll told the ALJ that he could walk for only one or two blocks before his legs began to ache "real bad," and that, after walking, his legs would swell, and eventually he "stopped trying to exercise."  (Tr. at 506).  Carroll admitted that in 1997 or 1998 he did not "often" use a cane.  (*Id.*).

Plaintiff also testified about his heart condition, explaining that, in 2001, he underwent quadruple bypass surgery.  He stated, in fact, that another operation was required after he suffered complications from the bypass.  (Tr. at 499).  Carroll testified further that, in 1997, long before the bypass surgery, he thought he had suffered a heart attack.   After the 1997 incident, he reported that he was still "having chest pains and they …  just kept giving different type medication and doing different tests, I guess, until they finally found that I did have a heart problem."  (Tr. at 501).  He stated that, during the period between 1997 and early 1998, he "usually" experienced chest pain "a few times a week."  (Tr. at 503).  Plaintiff also told the ALJ that he suffered from breathing and lung problems, and that "I could be sitting there talking to you and just like [that] my breath [—it] would be hard for me to breathe.  No reason.  It would just pass and I never knew when it would happen."  (Tr. at 502-03).

In regard to his other impairments, Plaintiff testified that, during 1997 and 1998, he experienced  pain  which was so severe that, two or three times a month, he could not get out of bed.  (Tr. at 506).  He testified that he suffered from moderate pain "about 60 percent of the days."  (*Id.*).  Carroll estimated that, during that time, he could lift items which weighed up to 40 pounds on occasion, and items weighing up to 20 pounds regularly.  (Tr. at 509).  He estimated that, during that era, if he stood for more than ten or fifteen minutes, his legs would "start aching bad."  (*Id.*).

John Guyton also testified at the hearing in support of Carroll's claim. (Tr. at 511). Guyton testified that he was Carroll's pastor, and he had known him since November 1998, or perhaps "a little before then." (*Id.*). He told the ALJ that they see each other "once or twice a month," and that, for as long as Guyton has known Plaintiff, "he's always walked with a cane," and had "problems with balance" and "limited mobility." (Tr. at 512). Guyton also testified that, for as long as they have been acquainted, Plaintiff has had "pain in his legs," and could not "sit for a long time." (*Id.*).

Carroll's wife also submitted a letter for the ALJ to consider. Mrs. Carroll wrote that, after his leg was broken, Plaintiff could no longer walk very well, that his gait was unsteady, and that he lost his balance easily. (Tr. 196). In her letter, she also reported that her husband has "long had heart and lung problems." (*Id.*).

The ALJ then posed questions to Caroline Fisher, a vocational expert witness, to determine whether there was work available to Plaintiff if he was unable to return to his previous employment as a truck driver. Fisher testified that Carroll's relevant work experience as an "over the road truck driver," is classified as a medium and semiskilled job. (Tr. at 519). The ALJ then asked Fisher the following hypothetical question, based on his findings from the credible evidence:

> (INAUDIBLE) light work, occasional balance problems. Also shouldn't be exposed to concentrated dust, fumes, or gases. That is he shouldn't have concentrated exposure. Would there be, and consider also his age, education, and work history. Would there be a significant number of jobs in the region or nation that such a person could perform?

(Tr. at 519). Fisher replied that those stated limitations "would probably take [Plaintiff] out of driving jobs." But, she continued,

> There would be other jobs that could be performed at the light, unskilled level, and those would number within the parameters taken altogether 40,000 or so could be performed, 40 to 50,000 at the light level within the region, five county region.

(*Id.*).

Plaintiff's attorney then took the opportunity to cross-examine Fisher, and he asked the following hypothetical question:

> [A]ssume for me under the first hypothetical [that] same person [] for physical reasons could not work, would be absent on a regular basis up to three days a month. Would that person be competitively employable?

(Tr. at 520). Fisher responded that such a person would not be able to work in a competitive setting. (*Id.*). She was then asked if her "answer would be the same if we limited the RFC to sedentary as opposed to light?" She replied that her answer would be the same. (*Id.*).

Based on the available evidence, the ALJ found that, in March 1998, Plaintiff could no longer work as a truck driver, but that he had the residual functional capacity to perform light work, including jobs that required only "occasional balancing," with no "concentrated exposure to dust, fumes, or gases." (Tr. at 17). With that finding, he denied Plaintiff's claim for disability benefits.

Here, Carroll complains, that the ALJ erred, in a number of ways, in evaluating the relevant evidence. His first area of complaint centers on the contention that the ALJ did not properly consider the severity of his multiple impairments in making his decision.

### *Residual Functional Capacity*

Plaintiff argues that the ALJ erred because he failed to consider all of his impairments fully in determining that he could perform light work. (Plaintiff's Motion at 8). Carroll contends that the record shows clearly that he suffers from painful ailments that prevent gainful employment. (*Id.* at 9). He charges, in particular, that the ALJ reached a faulty decision, in part, because he unfairly discredited his testimony about the level of his pain. (*Id.*). Carroll also insists that the ALJ failed to give proper weight to his treating physician's assessment that he is "disabled." (*Id.*). In

response, the Commissioner argues that Plaintiff did not bear his burden to prove that he was disabled on or before March 1998, and emphasizes that much of the evidence offered at the hearing was about events that occurred after his insurance had lapsed.  (Defendant's Memorandum at 6).

There is no doubt that "[t]he law of this Circuit requires consideration of the combined effect of impairments."  *Loza v. Apfel*, 219 F.3d 378, 399 (5th Cir. 2000).  And, an ALJ, therefore, errs if he evaluates the consequences of a claimant's individual impairments separately without regard to their combined effects.  *Id*.  (citing *Scott v. Heckler*, 770 F.2d 482, 487 (5th Cir. 1985); *Strickland v. Harris*, 615 F.2d 1103, 1110 (5th Cir. 1980)).  "The Act seeks to administer relief to the whole man, and not simply to serve as a vehicle for the separate clinical analysis of individual ailments."  *Scott*, 770 F.2d at 487 (quoting *Dorsey v. Heckler*, 702 F.2d 597, 605 (5th Cir. 1983)).  If an ALJ finds that "a medically severe combination of impairments" exists, after a review of the record as a whole, then "'the combined impact of the impairments will be considered throughout the disability determination process.'"  *Loza*, 219 F.3d. at 393 (quoting 20 C.F.R. § 404.1523).  It is important to emphasize, however, that Carroll has the burden to prove any disability that is relevant to the first four steps of the ALJ's analysis.  *Wren*, 925 F.2d at 125.  Absent such proof, a court should not disturb an ALJ's "determination that these impairments were not disabling."  *Id*.

At the outset, it must be emphasized that, for Plaintiff to prevail,  evidence must show that he was disabled on or before March 31, 1998.  *See Carey v. Apfel*, 230 F.3d 131, 134 (5th Cir. 2000).  For this reason, Carroll was required to establish that a disabling impairment existed "on or before" that date.  *(Id.)*.  In making his decision in this case, the ALJ first concluded that Plaintiff did suffer from "severe" impairments, including "heart disease, arthritis, and left knee surgery."  (Tr. at 15).  In making that determination, he relied on the records from Dr. Riley, Carroll's treating

19

physician from 1998 to 2000.  Those records detail complaints of coughing, chest pain, shortness

of breath, dizziness, and foot numbness.  (Tr. 454).  The ALJ noted that Dr. Riley initially speculated

that Carroll suffered from chronic obstructive pulmonary disease, but later deemed his respiratory

symptoms more likely due to allergies.  (*Id*.).  Further, Dr. Riley found the numbness in the legs, that

Plaintiff complained of, was consistent with a vitamin deficiency.  The ALJ then noted Plaintiff's

reported "history of alcohol use and a 31 year history of smoking one pack of cigarettes a day."  He

factored in Plaintiff's prior reported pneumonia, sinus congestion, arthritis, lipoma removal, and the

gunshot wound to the chest in 1993.  (Tr. at 16).  After listing all of this evidence, which is the only

evidence relevant to Carroll's claim, the ALJ found it "limited" in "showing severe limitations

affecting work-related abilities."  (*Id.*).

The ALJ noted, in particular, an echocardiogram in October 1998, which revealed "normal

heart size with no abnormalities."  (*Id.*).  This clinical data, even though beyond the date of Carroll's

eligibility status, revealed no heart impairment at that time.  He also reviewed Plaintiff's more recent

medical records, including those pertaining to his broken leg and the resulting peroneal nerve injury,

and  his own testimony on the alleged chest pain and shortness of breath during this period.  (Tr. at

17).  He found that evidence lacking to support a disabling impairment.  (*Id.*).  Finally, Dr. Hoang,

the  medical  expert,  acknowledged  that  a  "questionable  myocardial  infraction[7]  in  1997"  was

mentioned in the discharge summary from Park Plaza Hospital.  (*Id.*).  But he also testified that

there was no  evidence of any heart problems based on the test results in September 1999.  He stated

further,  that to assume that Plaintiff had severe heart disease before March 1998, was mere

speculation.  (*Id.*).  From all of this evidence, then, the ALJ found that "[t]he record does not fully

---

[7] A myocardial infarction is also known as a "heart attack."  *Mosby's Dictionary* at 1071.

support the claimant's allegations," and so he could have performed light work in 1998. The ALJ did acknowledge some restrictions, however, based on Plaintiff's hearing testimony. (Tr. at 17). From the record, as a whole, it is clear that the ALJ considered any and all available evidence relevant to Plaintiff's residual functional capacity during his period as an insured. On this record, the ALJ duly considered the combined effects of all of Plaintiff's impairments to determine whether he was disabled on or before March 1998. *See Loza*, 319 at 399. On this point, Plaintiff's motion for summary judgment should be denied.

Next, Plaintiff complains that the ALJ erred when he found that the record did not support Carroll's testimony about his pain and his limitations. (Plaintiff's Motion at 9). Carroll contends that his testimony was corroborated by John Guyton. He argues that Guyton's testimony that he had known Plaintiff before November 1998, and that he "always walks with a cane," and had "pain in his legs," was sufficient to show a disability in the relevant period. (*Id.*). In response, the Commissioner points out that Plaintiff did not produce any objective medical evidence to show that he had disabling pain, a heart condition, or any other disabling impairment prior to March 31, 1998. (Defendant's Memorandum at 10). She argues further that it was therefore proper for the ALJ to find Plaintiff's complaints on the extent of those impairments not credible. (*Id.*).

The law is clear that the ALJ must determine a claimant's residual functional capacity in light of any existing impairment. *Ripley*, 67 F.3d at 557 (citing 20 C.F.R. § 404.1546). To make this determination, the ALJ "must consider a claimant's subjective symptoms as well as objective medical evidence." *Wingo v. Bowen*, 852 F.2d 827, 830 (5th Cir. 1988). If the ALJ rejects a claimant's subjective complaints of pain, the reasons for so doing must be made clear. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994). For example, he may find that the claimant's subjective

complaints were "exaggerated and not credible," or he may find the medical evidence to be "more persuasive than the claimant's own testimony." *Id*. These credibility findings "are precisely the kinds of determinations that the ALJ is best positioned to make." *Id*. As such, they are "entitled to considerable judicial deference." *Haywood v. Sullivan*, 888 F.2d 1463, 1470 (5th Cir. 1989); *James v. Bowen*, 793 F.2d 702, 706 (5th Cir. 1986).

In this instance, the ALJ stated that he based his determination on "all of the medical opinions in the record." (Tr. at 19). Although he noted Carroll's reports of "chest pain and shortness of breath" in his decision, he concluded that they were "not totally credible." (Tr. 17, 19). The ALJ found, specifically, that

> [a]t the hearing, the claimant alleged that he had chest pain and shortness of breath. A discharge summary from January of [sic] 2001, stated in the medical history that there was a questionable myocardial infarction in 1997. The medical expert, Dr. Hoang, pointed out that when the claimant was last seen at Baylor Hospital in September of [sic] 1999, there was no mention of heart problems.… The record does not fully support the claimant's allegations.

(Tr. at 17). From his evaluation of the relevant medical evidence, the ALJ found that Plaintiff could have performed light work, with some restrictions, before his insurance expired. On this record, the ALJ satisfied his burden to explain his reasons for discrediting some of Plaintiff's testimony on his subjective complaints, and those credibility findings should not be disturbed. *See Falco*, 27 F.3d at 164; *Hollywood*, 888 F.2d at 830.

Plaintiff also argues that the ALJ disregarded the evidence from his "treating physician" that he was "disabled," and ignored this opinion in finding him capable of "light work." (Plaintiff's Motion at 9). Plaintiff contends that, because this opinion was not afforded the required "controlling weight," but was instead rejected, the ALJ was required to "articulate specific reasons" for doing so. *Id.* (citing *Kelly v. Chater*, 952 F. Supp. 419, 426 (W. D. Tex. 1996).

22

It is true, as Plaintiff argues, that, generally, more weight is given to the opinion of a treating physician than to those given by other medical professionals, including examining physicians and medical expert witnesses. *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001); *Loza v. Apfel*, 219 F.3d 378, 381, 354 (5th Cir. 2000); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994); 20 C.F.R. § 404.1527(d)(2). Indeed, the Fifth Circuit "has repeatedly held that ordinarily the opinions, diagnoses and medical evidence of a treating physician who is familiar with the claimant's injuries, treatment, and responses should be accorded considerable weight in determining disability." *Loza*, 219 F.3d at 395; *see also Myers*, 238 F.3d at 621; *Greenspan*, 38 F.3d at 237.

Here, however, as an initial matter, Plaintiff fails to identify which "treating physician" made the determination of alleged disability, or when that opinion was given. The court has found no record in which a treating physician has made any assessment, at all, of Plaintiff's ability to work. On this point, Carroll apparently argues that the notation in his 2001 hospital record, from Dr. Nasser, about a "questionable myocardial infarction in 1997," constitutes a medical opinion from his treating physician. (*Id.*). If so, Plaintiff's argument fails for two reasons. First, there is no showing that Dr. Nasser was Plaintiff's treating physician in 1997, when the alleged heart attack occurred. Second, this statement cannot reasonably be considered as a treating physician's "opinion." The reference to the 1997 event was made in the discharge summary when Carroll was released from Park Plaza Hospital, and it was included in the section of the record devoted to the patient's reported medical history. (Tr. at 239). It was certainly not included under any of the headings which suggest that it was an opinion or diagnosis from the physician who had treated him. In fact, the same notation appears on the hospital admission summary which was written the day

23

before.  (Tr. at 241).  Finally, nothing in that comment even suggests, much less concludes, that Plaintiff is "disabled."

Moreover, there is clear evidence in the record pointing to the fact that Plaintiff was not suffering from a disabling heart problem in 1998.  Because the other evidence is sufficient to contradict this "opinion," if, indeed, that is what it was, the ALJ was not required to seek clarification or additional evidence before rejecting it.  *Newton*, 209 F.3d at 453.  While the ALJ certainly could have  requested any necessary clarification of the comment, "development should not be undertaken for the purpose of determining whether a treating source's medical opinion should receive controlling weight if the case record is otherwise adequately developed." S. S. R. 96-2P.

Here, the record was adequate to allow the ALJ to conclude Plaintiff's level of impairment on the relevant data available to him.  Moreover, it is well-settled that reversible error in failing to develop the record results only if there is  a showing of prejudice to the claimant.  *Kane v. Heckler*, 731 F.2d at 1219 (5th Cir. 1984).   To secure relief here, Plaintiff must demonstrate "that additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision."  *Newton*, 209 F.3d at 458 (quoting *Ripley v. Chater*, 67 F.3d 552, 557 n.22 (5th Cir. 1995)).  Plaintiff has not identified any evidence which, if admitted now, would likely alter the ALJ's decision.  Plaintiff's motion for summary judgment, on this ground, should also be DENIED.

### Hypothetical Question

Finally, Plaintiff argues that the ALJ presented a faulty hypothetical question to the vocational expert witness because he failed to include any non-exertional limitations due to his painful arthritis and injured left leg.    (Plaintiff's Motion at 15).   Without those additional

limitations, Plaintiff claims that the witness overstated the number of jobs we was able to perform. (*Id.*). Carroll contends that the ALJ further erred because he did not require the vocational expert witness to name any specific jobs that he could perform, even given the limitations stated in the hypothetical question.  (*Id.*).  In response, the Commissioner argues that the hypothetical question was proper, and even if it was not, the relevant Medical-Vocational Guidelines dictate a denial of disability, in this case, given Plaintiff's age, education, and work experience.   (Defendant's Memorandum at 11).  Defendant claims that the expert witness' testimony is only additional evidence in support of the ALJ's findings on Carroll's claim.  (*Id.*).

In this circuit, it is clear that, to support a non-disability finding, any hypothetical question posed to a vocational expert witness must "incorporate reasonably all disabilities of the claimant [that are] recognized by the ALJ" and that are corroborated by the objective medical evidence. *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001); *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994); *and see Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000); *Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988).  In addition, the claimant must be

> afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question).

*Bowling*, 36 F.3d 436; *and see Boyd*, 239 F.3d at 707; *Carey*, 230 F.3d at 146; *Morris*, 864 F.2d at 335-36.

Here, as noted earlier, the ALJ considered Plaintiff's subjective complaints of pain, and determined they were "not fully supported" by the record.  (Tr. at 17).  For this reason, his decision not to incorporate all of them into the hypothetical question was proper under the law.  He did, however, acknowledge Plaintiff's complaints of coughing and shortness of breath and they were reflected in the hypothetical question to Fisher, in regard to limits on exposure to dust, fumes, or gases.  (Tr. at 519).  Likewise, Plaintiff's complaints of joint pain and weakness were included in

the hypothetical need to eliminate any work requirement to balance.  On this record, the court finds that the ALJ's hypothetical question reasonably incorporated all restrictions stemming from Plaintiff's credible exertional and non-exertional impairments, which existed on or before March 31, 1998.  *See Boyd*, 239 F.3d at 707; *Carey*, 230 F.3d at 145; *Bowling*, 36 F.3d at 436; *Morris*, 864 F.2d at 336.  More importantly, Plaintiff was given the opportunity to question the vocational expert witness and he could have corrected any perceived deficiencies in the ALJ's question.  *Bowling*, 36 F.3d at 436.  He did not do so, and Plaintiff's motion for judgment on this point should be denied.

Finally, Plaintiff apparently complains that the ALJ relied, improperly, on the SSA's medical-vocational guidelines to conclude that appropriate jobs are available to him.  He argues that the ALJ was required to have the vocational expert witness detail those specific jobs that are available to him, given his limitations, and not merely an make assertion that "work" exists in the national economy. (Plaintiff's Motion at 16).  In response, the Commissioner points out that Plaintiff has cited no law

in support of this contention, and that none exists. (Defendant's Response at 2).  In fact, Defendant claims that the relevant guidelines provide that no vocational expert witness testimony is required in this instance at all, much less testimony on specific available jobs.  (Defendant's Memorandum at 11).

Here, the ALJ found that Plaintiff was "not disabled" in "accordance with Medical-Vocational Rule 202.22."  (Tr. at 18).  In finding that Carroll fits within that Rule, the ALJ determined that he could do light work and that:

> Light work of involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

26

(Tr. 18).  *See also* C.F.R. § 404.1567(b).  The only restrictions the ALJ set on Plaintiff's capacity to perform light work were those relating to balance and environmental pollutants.  If a claimant has the capacity for the full range of light work, and "suffers from only exertional impairments or his non-

exertional impairments do not significantly affect his residual functional capacity, the ALJ may rely exclusively on the Guidelines [to determine] whether there is other work available that [Plaintiff] can perform."  *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *see also Fraga*, 810 F.2d at 1304.  In this case, the ALJ properly found from the relevant evidence that Plaintiff's capacity for the full range of light work was not compromised by his non-exertional limitations, and his reliance on the medical-vocational guidelines was appropriate.  *Fraga*, 810F.2d at 1304-05; *see also* 20 C.F.R. Pt. 404 Subpt. P, App. 2 § 200.00(b).  For this reason, the ALJ was not required to elicit any specific job titles from the vocational expert witness, and he did not err by not obtaining that testimony.  Accordingly, there was no error committed by the ALJ, and it is RECOMMENDED that Plaintiff's motion for summary judgment be DENIED.

**Conclusion**

Based on the foregoing, it is RECOMMENDED that the motion for summary judgment by Plaintiff Samuel Carroll be DENIED, and that the motion by Social Security Commissioner Jo Anne B. Barnhart be GRANTED.

The Clerk of the court shall send copies of this memorandum and recommendation to the respective parties who will then have ten (10) days from the receipt of it to file written objections thereto, pursuant to 28 U.S.C. § 636(b)(1)(c), General Order 80-5, S.D. Texas.  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.The original of any written objections shall be filed with the United States District Clerk, P.O. 61010, Houston, Texas 77208; copies of any such objections

shall be delivered to the chambers of Judge Lee H. Rosenthal, room 11535, **and** to the chambers of

the undersigned, Room 7007.

      **SIGNED** at Houston, Texas, this  21st  day of February, 2006.

                MARY MILLOY
          UNITED STATES MAGISTRATE JUDGE